2017 IL App (1st) 150575
No. 1-15-0575
Opinion filed March 31, 2017

FIFTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 09 CR 364 |
| SERGIO HERNANDEZ, | ) ) | The Honorable Thomas P. Fecarotta, Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justice Reyes specially concurred, with opinion.
Justice Lampkin concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1     After a jury trial, defendant Sergio Hernandez was found guilty of the first-degree murder of Rocio Munoz and of personally discharging the firearm that caused her death. 720 ILCS 5/9-1(a)(1) (West 2008) (first-degree murder with intent to kill); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2006) (25-year

sentencing enhancement for personally discharging a firearm causing death). Defendant was sentenced to 30 years for the murder and 25 years as a result of a firearm enhancement, for a total sentence of 55 years with the Illinois Department of Corrections (IDOC).

¶ 2 On a prior appeal, this court found that defendant's arrest was illegal, and we vacated defendant's conviction and remanded the case for an attenuation hearing. *People v. Hernandez*, 2013 IL App (1st) 103447-U, ¶¶ 42, 50 (unpublished order pursuant to Supreme Court Rule 23). Specifically, we remanded the matter to the trial court "with directions to conduct a hearing to determine whether defendant's statements at the police station were sufficiently attenuated from his illegal arrest to render it admissible." *Hernandez*, 2013 IL App (1st) 103447-U, ¶ 50. We also permitted the parties the opportunity on remand to develop a factual record bearing on defendant's claims of ineffective assistance of trial counsel. *Hernandez*, 2013 IL App (1st) 103447-U, ¶ 56.

¶ 3 After the trial court held the attenuation hearing, we instructed the trial court as follows: "Should the trial court find defendant's confession was sufficiently attenuated from his illegal arrest, we direct the court to reinstate defendant's conviction. In the alternative, if the trial court determines that no such attenuation exists to purge the confession from the taint of defendant's illegal arrest, we direct the trial court to suppress the confession and conduct

further proceedings consistent with this opinion."  *Hernandez*, 2013 IL App (1st) 103447-U, ¶ 50.

¶ 4        On remand, the trial court held an attenuation hearing and found that defendant's statement to the police at the police station was sufficiently attenuated from his earlier arrest to be admissible at trial; and, following our directions, the trial court reinstated defendant's conviction.

¶ 5        Defendant now appeals the trial court's decision, arguing: (1) that the trial court erred in finding attenuation; (2) that his counsel at the attenuation hearing had a conflict of interest, since the appellate court permitted defendant on remand to address his claim that his trial counsel was ineffective for failing to move to suppress his statement as involuntary, and the same trial counsel continued to represent defendant on remand  (*Hernandez*, 2013 IL App (1st) 103447-U, ¶ 56 (permitting the parties " 'an opportunity to develop a factual record' ") (quoting *People v. Bew*, 228 Ill. 2d 122, 135 (2008)); and (3) that this counsel was ineffective for failing to move to suppress defendant's statement as involuntary (*Hernandez*, 2013 IL App (1st) 103447-U, ¶ 56 ("depending on what is entered into the record on remand, ineffectiveness *** could be addressed on direct appeal").

¶ 6       For the following reasons, we reverse defendant's conviction, suppress the statement he made at the police station and remand for further proceedings consistent with this opinion.

¶ 7                        BACKGROUND

¶ 8       In the evening of November 25, 2008, the victim, Rocio Munoz, was found shot in the head while in her vehicle, which was parked on West Irving Park Road in Hanover Park, Illinois. On December 22, 2008, defendant, her former boyfriend, was indicted for her murder.

¶ 9              I. Pretrial Motion to Quash Arrest

¶ 10       Prior to trial, defendant filed a motion to quash his arrest and suppress evidence on the ground that he was illegally arrested at his home without probable cause or a warrant. After holding a suppression hearing, the trial court concluded that defendant was not arrested at his home. On appeal, this court reversed the decision of the trial court and found that an arrest had occurred. *Hernandez*, 2013 IL App (1st) 103447-U, ¶ 2. We described the testimony at the suppression hearing in detail in our prior decision, and we will not repeat it here. *Hernandez*, 2013 IL App (1st) 103447-U, ¶¶ 4-9. In sum, more than 20 police officers, some armed, arrived at defendant's home, handcuffed him and patted him down, and then removed his handcuffs and seated him next to an armed officer in the back of a police vehicle and transported him to another

police vehicle, which then transported him to an interrogation room in a police station, where he was questioned from nine at night until almost three in the morning. This court concluded that no reasonable person in defendant's shoes would have thought that he or she was free to leave. *Hernandez*, 2013 IL App (1st) 103447-U, ¶¶ 42, 46.

¶ 11                                    II. Evidence at Trial

¶ 12         Except for a few statements, the testimony at trial was not described in our prior opinion, so we provide a description here.[1]

¶ 13         At trial, Jose Munoz[2] testified that his sister Rocio, the victim, had dated defendant for three or four years, until 6 months before she died. Rocio, who had immigrated to the United States in 2005 from Mexico, had known defendant in Mexico. At the time of her death, Rocio was living with her brother Jose and their two brothers, and they had all lived together for three years. For four years, Rocio had worked cutting hair, and during the last six or eight months before her death, she had worked at a salon on Irving Park Road, in Hanover Park.

---

[1] A review of the evidence at trial is also necessary for our determination that there is sufficient evidence to justify a remand for a new trial without running afoul of the double jeopardy clause. *Supra* ¶ 132.

[2] Since both the witness and his sister share the last name of Munoz, we refer to them by their first names to avoid confusion.

¶ 14        Rafael Delatore Guzman testified that, in November 2008, he was dating Rocio. On November 25, 2008, he met her at 8 p.m. as she was leaving the hair salon where she worked. The salon was in a shopping center on Irving Park Road. The two of them walked to her vehicle, which was parked in the parking lot in front of the salon. While Rocio was removing some bags from the front passenger seat to the back of the vehicle so that Guzman could sit down, Guzman observed a man walking in front of the vehicle. The man was 6 feet tall, 184 pounds,[3] and dressed in a black hooded sweatshirt, with the hood over his head, such that Guzman could not observe his face. After Rocio told Guzman that he could enter the vehicle, Guzman was entering when he heard a shot. After the shot, Guzman testified: "I just saw Rocio move." Guzman then entered a nearby supermarket. However, as Guzman reached the store, he turned around and observed the same man walking on the sidewalk. After entering the store, Guzman asked one of the workers to call the police and an ambulance. When Guzman observed the first police vehicle arrive, he went outside and walked to Rocio's vehicle with a police officer. When Guzman reached her vehicle, he opened the passenger door and observed Rocio lying on the passenger seat, and he grabbed her and lifted her up, and he observed that

_____

[3] None of the witnesses testified at trial as to defendant's weight and height.

her face was full of blood. Blood was on her face and the vehicle seat, and on all of her clothes.

¶ 15    Detective Hugo Villa, of the Hanover Park Police Department, testified that, on November 25, 2008, he was a police officer and he responded to a call at 8:11 p.m. directing him to a shopping center on Irving Park Road. After arriving there, Villa observed a woman slumped forward in the driver's seat of a silver Ford parked in the parking lot, and she was covered in blood. The driver's side door was closed, and the window was shattered, with a partial hole in the window. After Villa opened the door, he grabbed the woman by her left shoulder and pulled her back, so that she sat up in her seat.[4] Villa observed a gunshot wound behind the woman's left ear and did not observe any signs of life. As Villa called the dispatch officer, he noticed a spent shell casing outside the vehicle, within a foot or two of the driver's side door. However, Villa was not able to determine the caliber of the shell casing. While at the scene, he spoke with Rocio's then current boyfriend, whose name Villa could not recall.

¶ 16    Nicholas Rossberg, a paramedic with the Hanover Park Fire Department, testified that, on November 25, 2008, he received a dispatch at 8:12 p.m. and

---

[4] Guzman testified that, when he observed the first police vehicle arrive, he walked to Rocio's vehicle with a police officer and that Guzman, not the officer, opened the passenger door and grabbed Rocio and lifted her up.

that, when he arrived on the scene, Rocio was not responsive and not breathing, and had no pulse. She was transported to St. Alexius Medical Center.

¶ 17     The parties then entered a stipulation that if Dr. Karla Dunston was called to testify, she would testify that on November 25, 2008, she was an emergency room physician at St. Alexius Medical Center in Hoffman Estates, that Rocio arrived at 8:36 p.m. with a gunshot wound to the back of her head behind her left ear and was pronounced dead at 8:44 p.m. The parties also stipulated that, if Dr. Kendall Crowns was called to testify, he would testify that he was a deputy medical examiner for Cook County and that the cause of Rocio's death was a gunshot wound to the head.

¶ 18     Edgardo Lopez, a Hanover Park police officer, testified that, on November 25, 2008, he was a member of the Major Case Assistance Team (MCAT), and they went to Aurora to locate defendant who was a suspect. After police had "put out word that [defendant] was being looked for," defendant called the police. While in Aurora, Lopez, who was fluent in Spanish, spoke on the phone with defendant who provided directions; and the officers then went to an apartment building where defendant was waiting outside. Defendant did not run or resist. Other officers approached defendant and transported him to the Hanover Park police station.

¶ 19    David Scot Carlson testified that, on November 25, 2008, starting at 4 p.m., he was working as a bouncer at a bar in Hanover Park, located at Irving Park Road and Jensen Street, approximately 100 yards from the shopping center with the hair salon. Carlson had two prior convictions for theft. Shortly after 4 p.m., he stepped outside for a cigarette and observed a black or blue Ford F150 pick-up truck with "flared out" back wheels parked on Jensen Street. Part of Carlson's job is to patrol the bar's parking lot. Carlson observed the same truck at 8 p.m.[5] and also observed, "in the retention pond an officer with two gentlemen on the ground, possibly at gunpoint." Carlson was not asked to explain what a retention pond was or to describe it, but he did state that the pond was "on the other side of the truck." Carlson returned to the bar, and thus did not observe what happened to the two men. The next day, when Carlson returned to work, he noticed a picture of the truck behind the bar. Carlson then called the Hanover Park Police Department and Hanover police came to Carlson's home on December 2, 2008. Carlson then went with the police to the Hanover Park police station, where he observed the same truck parked in the police parking lot. The police did not point the truck out to him; he just noticed it.

---

[5]Detective Villa testified that he received a dispatch about the murder at 8:11 p.m.

¶ 20          Lisa Koenen, an evidence technician with the Village of Hoffman Estates, testified that, on November 25, 2008, she went to St. Alexius Medical Center to photograph the victim's body. In addition to observing a gunshot entrance wound on the side of the victim's head, Koenen also observed four pieces of glass fragments in the victim's hair. Koenen was also present during the subsequent autopsy at the Cook County Medical Examiner's Office and she took custody of the "fragmented projectiles"[6] removed by the medical examiner from the victim's head which had lodged behind the victim's right eye. On November 26, 2008, at 8:30 p.m., Koenen also photographed the exterior of the apartment building where defendant resided and where he had been located earlier that day. There was a truck parked by the side of the building that Koenen photographed. When she looked through the truck's windows, Koenen observed a black plastic gun holster underneath the front passenger seat.

¶ 21          The parties then stipulated that, if Ernie Dannenberger were called to testify, he would testify that he is the Director of the Vehicle Services Department for the Illinois Secretary of State and that a 1999 Ford F150 with a certain license plate number was registered to Jose M. Hernandez in Aurora, Illinois.

---

[6] Koenen referred to the items she received as "fragmented projectiles." She did not identify a caliber or type.

¶ 22          The parties further stipulated that if Jose Hernandez[7] were called to testify he would testify that he helped defendant, who is his nephew, purchase a dark blue Ford F150 truck and that, as a result, Jose is listed as the owner. Although Jose was listed as the owner, he never used or drove the truck which belonged to defendant. In the early morning hours of November 27, 2008, when Hanover Park police officers came to his home, Jose signed a consent form allowing them to search the truck.

¶ 23          Thomas Todd, a forensic technician with the Schaumburg police department, testified that, on November 28, 2008, he processed the blue Ford F150 truck and recovered (1) a black plastic gun holster and a pair of white women's panties from the center console hump on the front-seat floor, and (2) multiple small broken-glass fragments from the driver's side front-seat floor mat.[8] Based on the shape of the holster and the lack of an area for a cylinder, the holster appeared to be a holster for an automatic weapon.

¶ 24          Sergeant Kevin Conway testified that he worked for the Hanover Police Department and that, on November 29, 2008, he traveled to defendant's

---

[7] Since both defendant and his uncle share the same last name of Hernandez, we will refer to the uncle by his first name in order to avoid confusion.

[8] Lisa Koenen, an evidence technician, testified that she observed glass fragments in the victim's hair.

building and, near the rear garage door, he observed some burnt black clothing[9] with a partial zipper. The pile also included a scale. In December 2008, Conway transported David Carlson from Carlson's home to the police station, and then to the bar where Carlson worked. Conway then parked his unmarked police vehicle in the location where the truck had been parked on the night of the murder, and photographed the area. The location was less than a block from the shopping center.

¶ 25    The parties stipulated that, if Monica Ramirez were called to testify, she would testify that she is fluent in both English and Spanish, that she accurately translated the videotaped interview of defendant on November 27, 2008, from Spanish into English, and that her transcript was used to create English subtitles for a video of approximately the last hour of the interview.

¶ 26    In a sidebar, the parties agreed that, although there was an English translation and transcript of the entire six-hour interview, the jury was not going to receive that transcript. Instead, the jurors were going to watch a video of approximately the last hour of the interview with English subtitles. With respect to the written transcript, the trial court stated: "You can put it into evidence. It's just not going to the jury." The trial court later stated, and the parties agreed,

---

[9]Guzman, the victim's boyfriend, testified that the shooter wore a black hooded sweatshirt.

that People's Exhibit #61, which was the entire transcript, was "not in evidence."

¶ 27        Alvaro Fernandez, a police officer with the Village of Hoffman Estates, testified that, on November 26, 2008, at 9 p.m., he met defendant in an interview room at the Hanover Park police station.  Fernandez is from Cuba and fluent in Spanish.  Defendant indicated that he spoke only a little English and was more comfortable with Spanish, so Fernandez spoke to him in Spanish, first advising defendant of his Miranda rights.  The interview lasted from 9 p.m. until 2:45 a.m.  At first, Detective Ralph Griewosz was also in the interview room but, since Griewosz did not speak Spanish, Griewosz left between 10:30 and 11 p.m. and was replaced by Detective Juan Miranda who spoke Spanish.

¶ 28        The jury then viewed a video of only the last 57 minutes of the interview with defendant.  While the interview was in Spanish, the video contained simultaneous English subtitles.  The video, which the jury viewed, also contained information which was not otherwise introduced into evidence at trial. Thus the jury viewed: (1) the police suggesting that Rocio's boyfriend had already identified defendant from a photo array;[10] (2) the police telling

---

[10] On the video, the police officers stated:  "We – the Rocio's boyfriend, she was with him, when this happened.  We showed him this. *** And whose picture do you think he picked out."  They also stated:  "Why do you think Rocio's boyfriend – he doesn't know you and you don't know him -- *** No and why

defendant that individuals named "Alejandro" and "Alfredo"[11] had separately informed them that defendant had left his home before 7 p.m. on the night of the murder wearing a black hooded sweatshirt and that the two men knew it was before 7 p.m. because their soap operas had not yet started; (3) the police telling defendant that they had discovered a receipt in defendant's room which proved that defendant was at a market at 6:14 p.m. on the night of the murder and then showing defendant the receipt; and (4) the police performing a gunshot residue test on defendant's hands and telling defendant that the result was positive for the presence of gunshot residue.

¶ 29    However, none of these alleged facts were substantiated at trial. First, although the jury viewed the police seeming to indicate that Rocio's boyfriend had positively identified defendant, Guzman testified at trial that he did not view the shooter's face. Second, although the jury viewed the police telling defendant that "Alejandro" and "Alfredo" had informed them that defendant had left his home before 7 p.m. wearing a black hooded sweatshirt, no one by either name testified at trial. Third, although the jury viewed the police informing

would he – he doesn't know you. We didn't tell him who you were. We showed him this and who do you think he picked out?"

[11] In an earlier part of the video which the jury did not view, defendant stated that, on the night of the murder, he was with his two friends and room mates, Alejandro and Alfredo, for a portion of the evening. Defendant did not state their last names.

defendant that they had discovered a receipt in his room showing that defendant was at a market at 6:14 p.m., no such receipt was introduced at trial. Fourth, although the jury viewed the police ostensibly performing a gunshot residue test on defendant's hands and informing defendant of the positive result, the jury was never informed that this was a bogus or fake test, as later described in the subsequent post-appeal attenuation hearing.

¶ 30    In the video that the jury watched, the officers asked defendant if they had his "permission" to "check" his hands for gunshot residue, and defendant asked "what are my rights?"  One of the officers replied:  "I'm asking you.  If you don't want we won't do it[.]"  After defendant explained that he had shot a "BB gun" a week ago, the officer indicated that would not affect the test.

¶ 31    In the video, the officer stressed that gunshot powder would stay on a person's hands for months and that washing and scrubbing would not remove it. When the officers then asked if defendant wanted the gunshot residue test, he replied:  "Do it."

¶ 32    The officers then offered defendant the opportunity to take a lie detector test, and defendant replied "[d]o it" and stated repeatedly that he would pass it. However, no lie detector test was given.

¶ 33    The video depicts the officers asking defendant repeatedly what would happen if he did not pass the lie detector test, and defendant replying each time:

"I'll pass it." Finally, in exasperation, the officer stated, "[t]hat's not the question," and defendant replied: "If I don't pass it that means I'm guilty." After more questions by the officers, in which they kept asking defendant why defendant was lying to them, a third person entered the interrogation room carrying a kit and defendant said: "Let's shut up and do the test."

¶ 34    Immediately before the officers performed the bogus gunshot residue test, one of the officers asked the apparent technician if he was ready and he replied that he was. The technician explained in English how the test worked, while one of the officers translated his words into Spanish. The technician stated that, if defendant had fired a gun in the last 24 or 48 hours, "[t]his test will tell me whether or not you did it. This test will say if you did it or not." The technician explained that he was going to apply a chemical to defendant's hands and that the chemical would turn pink if defendant had shot a gun.

¶ 35    However, before performing the test on defendant, the technician stated that he was first going to perform the test on one of the officers. The technician asked defendant "sound fair?" and defendant said yes. Defendant then watched as the technician, who was wearing rubber gloves, rubbed a piece of cloth or paper on the officer's right hand, and then dipped it into a solution, waited a moment and then announced "no pink."

¶ 36          The technician then rubbed a piece of paper or cloth against each of defendant's hands, then dipped it into a solution, waited a moment and then showed it to defendant, asking "[w]hat color is that?" Defendant answered "[p]ink."

¶ 37          The technician asked defendant "what do you think pink means," and defendant replied "I don't know." One of the officers then asked the technician if the test would turn pink from a BB gun, and the technician answered no, that it would turn pink only from gunpowder. The technician then packed up his kit and exited the room.

¶ 38          The officer asked defendant: "Were you trying to scare her? Was it an accident?" After defendant replied that he had "nothing to say," the officer asked if defendant wanted the officer to think he was "a monster" and that defendant had "killed her like a dog." That is when defendant said, echoing what the officer had said before, "[i]t was an accident."

¶ 39          When asked how it happened, defendant stated that he did not know about guns, that he wanted to speak with Rocio, that he was nervous, that he turned so that she would not look at him and that he then "kind of pulled the trigger." When asked where the gun was, defendant stated that he threw it in a river in Aurora and that it was "all mashed up." When asked where he obtained

the gun, defendant replied "from some black guy." Defendant did not know either the type of gun or the type of bullet.

¶ 40    Both the subtitles and the typed transcript state repeatedly that defendant "brunt" his clothes. Although "brunt" is a word, this court presumes that "brunt" is a typographical error, and that the translator meant "burnt." In the video, defendant stated that he burnt his clothes on the cement outside his house and then threw the ashes in the river.

¶ 41    Defendant stated: "It was an accident that's all I know. I myself killed her but honestly I wasn't going to shoot her. I didn't want to shoot her. It was an accident. The gun was very vulnerable." The officers asked what he did when he saw Rocio walking toward her vehicle, and he replied: "I like tried talking to her. But for her to open the door I was like let's see if she opens it to speak with her or if she'll let me get in the car." Defendant stated that Rocio did not open the vehicle.[12]

¶ 42    When asked about the holster found in his vehicle, defendant stated that he did not know about the hostler, that he did not know where the hostler came from and that it was not his. About the gun, defendant stated: "I was trembling because I've never had a weapon."

_____

[12] Although defendant stated that Rocio did not open the vehicle door, she was found seated inside the vehicle.

¶ 43        After the jury watched the video, Detective Fernandez resumed his testimony. Fernandez testified that defendant informed him that defendant had broken the gun into pieces and thrown them into a river. On November 27, 2008, Fernandez and 20 other officers drove with defendant to Aurora to search for the gun. Defendant first indicated that he had thrown pieces of the gun off a pedestrian bridge and also from a park along the Fox River. When Fernandez accused defendant of lying, defendant said that he had thrown the whole gun out his vehicle's window into a grassy lot in Aurora. After a search of the lot, no gun was found.

¶ 44        When the assistant State's Attorney (ASA) asked "this story about it being an accident, who was the first one that used the word accident and suggested accident during this interview," Detective Fernandez replied: "That was me, sir." When asked. "[i]t was not the defendant that first said that this was an accident, is that correct?" Fernandez replied: "No. It was part of my theme." Fernandez further testified:

> "ASA: And it was you that first said 'maybe this was an accident,' is that right?
>
> FERNANDEZ: That's correct.
>
> ASA: And basically, he said 'yeah, that's it. It was an accident,' right?
>
> FERNANDEZ: After I brought that theme out several times, yes."

¶ 45    Both parties rested. During closing arguments, the ASA argued, repeatedly and without objection that Rocio had been shot with a 9-millimeter semiautomatic handgun. However, the gun was not recovered, and none of the witnesses testified that the shell casing found on the scene or the fragments removed from the victim's head were fired from a 9-millimeter semiautomatic handgun.[13] The defense attorney argued that Rocio's death was an accident and asked the jury to find defendant guilty of involuntary manslaughter. During the jury instructions, the trial court told the jury: "The tape and not the subtitles is the evidence. If you perceive a conflict between the tape and the subtitles, the tape controls." After listening to the court's instructions, the jury found defendant guilty of both first degree murder and personally firing the firearm which caused Rocio's death.

¶ 46    III. Posttrial Motions, Sentencing and First Appeal

¶ 47    On August 23, 2010, the trial court denied defendant's posttrial motion for a new trial which argued, among other things, that the court erred in denying defendant's motion to quash his arrest and suppress evidence. At sentencing, the trial court listened to factors in mitigation and aggravation, including the fact

---

[13]Lisa Koenen, the evidence technician, testified that she recovered "fragmented projectiles" which the medical examiner removed from the victim's body, but Koenen did not identify a type or caliber number. Similarly, Detective Hugo Villa testified that he recovered a spent shell casing outside the victim's vehicle but that he was not able to determine the caliber of the shell casing.

that the 25-year old defendant had no prior contact with the law in the United States or in his native Mexico. The minimum possible sentence was 20 years for first-degree murder and an additional 25 years to life for personally discharging the firearm which caused the death, for a total minimum sentence of 45 years with IDOC. After considering factors in mitigation and aggravation, the trial court sentenced defendant to 30 years for the murder and 25 years for the firearm enhancement, for a total of 55 years with IDOC.

¶ 48     On November 10, 2010, the trial court denied defendant's motion to reconsider the sentence, and defendant's first appeal followed. As we already indicated, this court found that defendant's arrest was illegal, and we vacated defendant's conviction and remanded the case for an attenuation hearing. *Hernandez*, 2013 IL App (1st) 103447-U, ¶¶ 42, 50 (unpublished order pursuant to Supreme Court Rule 23). We directed the trial court "to conduct a hearing to determine whether defendant's statements at the police station were sufficiently attenuated from his illegal arrest to render it admissible." *Hernandez*, 2013 IL App (1st) 103447-U, ¶ 50. We also permitted the parties the opportunity on remand to develop a factual record bearing on defendant's claims of ineffective assistance of trial counsel. *Hernandez*, 2013 IL App (1st) 103447-U, ¶ 56.

¶ 49                    III. Request for New Counsel On Remand

¶ 50        After the case had been remanded, but before the attenuation hearing

occurred, the parties appeared before the trial court on April 3, 2014, and

defendant asked for new counsel. On this appeal, defendant claims that he

should have received new counsel for the attenuation hearing because his trial

counsel had a conflict of interest.

¶ 51        On April 3, 2014, the following colloquy occurred, through a translator,

between defendant and the trial court on the subject of new counsel:

        "DEFENDANT: I want to ask this honorable Court, or the Judge, the

        appointment for a moritas (phonetic) force.

        THE COURT: For what?

        ASSISTANT PUBLIC DEFENDER (APD): Judge, I believe what

        he's trying to say is murder task force.

        THE COURT: Okay.

        DEFENDANT: Murder task force. And the reason for which I ask

        this is because my attorney on the last court date, in front of several

        people, told me that she didn't want to do my case, and if it were up to

        her, she would not have taken my case. I have been speaking with her,

        and she doesn't want to bring [to] the Judge's attention some important

points or issues that I believe is for my defense. And I have the name of the witnesses that heard her say that.

THE COURT: Okay. [Defendant], please put that document away. All right. Here. You're entitled to the representation of the Public Defender's Office, okay? This is up today for a hearing on what we call attenuation, all right? I don't know if [the APD] explained it to you, but I'm sure she did.

What I'm going to do is I'm going to hold that hearing pursuant to the mandate, or pursuant to the direction of the appellate court on remand, okay? And there will be – the Court will hear evidence, and you will be present. You will be represented by [the APD].

You can't pick and choose which [APD] to get."

¶ 52    The trial court then asked the APD to respond to defendant's allegations:

"THE COURT: [APD], would you please – I'm concerned about what he said. Could you please respond to his allegation that you – did you tell him that you don't want to—

APD: No, Judge. What happened is [defendant] expressed displeasure with me. I told him that if he didn't want me representing him, I wouldn't want to have to represent him. However, I am assigned

23

to his case. I would not want to represent someone that did not want me to represent him.

THE COURT: This matter is here for an attenuation hearing, and that's what it's here for, and that's what's going to happen.

So we'll see you on May 20th, 2014, because you have a right to be present for that hearing, okay? See you then.

APD: Judge, in addition, I told him that he had the option of hiring private counsel if he chose.

DEFENDANT: Your Honor—

THE COURT: I said that's the order. Thank you."

¶ 53 On May 20, 2014, the APD informed the trial court that she was not ready to proceed with the attenuation hearing because she "received a 27-page document written by [her] client indicating things he wanted [her] to address" and she had not yet had to time to read it." In response, the trial court rescheduled the hearing for June 30, 2014.

¶ 54 IV. The Attenuation Hearing

¶ 55 During the State's opening statement at the hearing, the ASA argued, among other things that, even though the gunshot residue test was false, it still served as an intervening circumstance between the illegal arrest and defendant's subsequent confession.

24

¶ 56    At the hearing, Detective William Kirby testified that he was employed by the Village of Arlington Heights and assigned to MCAT and that, during the afternoon of November 26, 2008, he traveled to the home of defendant's uncle, Jose Hernandez, in Aurora and asked Jose to have defendant call Kirby. Kirby told Jose, who spoke perfect English, that Kirby wanted to talk to defendant about defendant's ex-girlfriend. At 7:15 p.m. that day, defendant called.

¶ 57    Kirby testified that defendant spoke some English but not well. During the call, Kirby told defendant that Kirby wanted to speak with him about his ex-girlfriend and defendant said that he would talk to Kirby. Defendant asked Kirby to "come pick him up" and Kirby agreed. Kirby did not speak Spanish and he had to ask Ed Lopez, a Spanish-speaking officer, to call defendant back because Kirby did not understand defendant sufficiently to understand the street address which defendant provided.

¶ 58    Kirby testified that he contacted his commander, and that his commander contacted the Aurora Police Department. At 8:30 p.m. Kirby, Lopez and other officers arrived at defendant's location in Aurora. The officers at the location included David Warnes, Kirby's commander; Ed Lopez from the Hanover Police Department; and "a bunch of uniform[ed] officers [from] Aurora" whom Kirby did not know. There were approximately 20 officers present. When Kirby first arrived, defendant, as well as five or six other Hispanic males, were

already in handcuffs.  Kirby did not observe any guns drawn. However, other officers had already been there approximately 20 minutes and Kirby did not know whether guns had been drawn prior to Kirby's arrival. When Kirby first observed defendant, defendant was handcuffed with his hands behind his back[14] and walking toward Kirby's vehicle in the company of two or three officers, with one officer walking next to defendant and one or two officers walking behind.

¶ 59    Kirby testified that, after defendant was walked to Kirby's unmarked vehicle, Kirby asked a uniformed Aurora officer who accompanied defendant to remove defendant's handcuffs which he did.  Kirby asked defendant:  "Are you coming with me to the police station?"  Defendant replied yes, and entered the backseat.  Kirby's partner, Gary Mitchell sat next to defendant. Both Kirby and Mitchell wore guns, but Kirby did not believe that his gun was visible. Kirby explained that there was little conversation as he drove because defendant's "English is not good and my Spanish is not good."  However, Kirby testified that he "explained to [defendant] that [Kirby] was driving him to the Hanover Park Police Station."  Kirby testified that, after the handcuffs were

---

[14] The State did not establish at the attenuation hearing the exact time that defendant was first arrested.  When this court explained why we were remanding for an attenuation hearing, we stated that we were missing key facts. For example, we observed:  "Based on the record, we do not know exactly when defendant was arrested." *Hernandez*, 2013 IL App (1st) 103447-U, ¶ 46.

removed, the "tenor" was "cordial and pleasant." However, neither Kirby nor Kirby's partner Mitchell told defendant that he was free to leave.

¶ 60    Kirby testified that, during the drive, he received a phone call informing him that two Spanish-speaking officers were going to meet them half-way, so Kirby pulled into a gas station in West Chicago; and another unmarked police vehicle arrived shortly with officers Fernandez and Miranda, who spoke Spanish, and a third officer whom Kirby did not know. These three officers were all in plain clothes. Kirby exited his vehicle and opened the door and asked defendant to exit. The other officers shook hands with defendant, and defendant entered the back seat of their vehicle. Fernandez drove that vehicle, and Miranda sat in the back seat with defendant.

¶ 61    Before the next witness, the trial court observed that defendant's lawyer did not speak Spanish, and the court informed defendant that if, at any time during the proceedings, he wanted to speak to his lawyer, he should raise his hand and the court would stop the proceedings so that he and his lawyer could use the interpreter.

¶ 62    Detective Alvaro Fernandez testified that he was a detective with the Hoffman Estates Police Department and that, in November 2008, he was an investigator with MCAT assigned to investigate Rocio's death. Between 7:15 and 8:15 p.m. on November 26, 2008, he traveled with Detectives Juan Miranda

and Ralph Gniewicz to a gas station to meet Detective Kirby who was transporting defendant. Fernandez, Miranda and Gniewicz were all in plain clothes, and carrying guns. Fernandez testified that the bottom of his holster may have been visible from under his jacket when he sat down. In Spanish, Fernandez informed defendant that they were transferring vehicles and told defendant "we're going to go in this car." Fernandez opened the rear left door of his unmarked Dodge Charger, and defendant entered the back seat. Miranda sat next to defendant in the back seat; Gniewicz drove; and Fernandez sat in the front passenger seat. Defendant asked Miranda what this was about and Miranda replied that they would talk about it when they arrived at the police station. They drove ten to fifteen minutes to the Hanover Park Police Department, where defendant was brought into an interview room which was eight feet by eight feet with a table and a couple of chairs.

¶ 63    Fernandez testified that defendant was alone in the interview room for about 20 minutes before Fernandez and Gniewicz reentered. The door to the room was shut but Fernandez does not know if it was locked. Before the officers reentered, video equipment was in operation. Fernandez's first language is Spanish, and he spoke to defendant in Spanish. Fernandez thanked defendant for coming, and defendant responded "okay." Fernandez then read defendant his Miranda rights from a preprinted form. After reading each right, Fernandez

asked defendant if he understood and defendant would "nod his head and say uh-huh." While Fernandez understood defendant's response to mean yes, Fernandez did not ask whether it meant yes. When Fernandez asked defendant if he would speak with Fernandez, defendant did not verbally respond but he nodded his head silently up and down. Fernandez then asked: "Do you wish to speak with me? Do you know why you're here?" In response, defendant nodded his head no,[15] and Fernandez did not ask him to clarify whether he meant: no, he did not want to speak with defendant; or no, he did not know why he was here. Fernandez understood the response to indicate an agreement to speak with Fernandez.

¶ 64        Fernandez testified that the interview lasted five hours and 45 minutes. There were two periods of time when defendant was left alone for 10 to 20 minutes. Defendant asked to use the bathroom once, and a Hanover Park police officer took him. After defendant exited the bathroom,[16] he went directly back to the interview room. Defendant received a bottle of water and, after the interview, he ate a hamburger. During the interview, he was asked if he was hungry and he said no.

___

[15] The written transcript states: "Q: Do you want to speak with me? Do you know why you're here? A: No. Q.: No? Okay well if you like we can talk about that."

[16] Detective Miranda later testified at the hearing that an officer escorted defendant to a jail cell to use the bathroom and stood outside the cell while defendant used the bathroom.

¶ 65        Fernandez testified that, at some point during the interview, he asked defendant for his consent to search his vehicle. Defendant asked: "Okay. Hold on. Hold on. Can't I ask anybody to verify if that's legal?" and Fernandez responded: "What? You think I'm going to put something in your truck? How am I going to do that? I don't understand what you want." Later in the interview when Fernandez asked defendant to submit to a gunshot residue test, defendant responded by asking what his rights were. Fernandez testified that, after he called defendant a liar several times, defendant agreed to take the test. .

¶ 66        Fernandez testified that Detective Charles Buczynski entered the room to perform the test approximately five hours into the interview. Buczynski swabbed defendant's hands and "the supposed results were done instantaneous[ly]." About 10 to 15 minutes later, defendant began making incriminating statements.[17]

¶ 67        The State moved into evidence the entire transcript of the interview with defendant, and it was admitted without objection. The parties also entered into a stipulation that two DVDs depicted the entire interview with defendant, and they were moved into evidence by the State and admitted without objection.

¶ 68        Detective Juan Miranda testified that he was a detective with the Hanover Park Police Department, and that he first met defendant on November 26, 2008.

---

[17] Those statements were already described above at ¶¶ 38-42 and will not be repeated here.

Miranda was with his partner, Detective Griewosz, and Detective Fernandez in an unmarked police vehicle. Defendant exited the vehicle that he was in, and the three officers introduced themselves, informing him that they were all police officers. All three officers were armed. They escorted defendant to their vehicle, opened the door and asked him to enter. Miranda sat next to defendant, and defendant asked him why he was being taken to the police station. Miranda did not testify as to his response. They then transported defendant to the Hanover Park Police Department and took him to an interview room that was not locked. Miranda was not initially involved with the interview, but entered the room later. Miranda, who is fluent in Spanish, recalled that defendant was offered food and drink and allowed to go to the bathroom. Defendant did not want any food and asked for water, and he did go to the bathroom. An officer escorted defendant to a jail cell to use the bathroom and stood outside the cell while defendant used the bathroom. Later defendant was given food.

¶ 69 Miranda testified that he was present when the "purported" gunshot residue test was administered and defendant was informed that the result was positive. This occurred several hours into the interview. Miranda testified that it was at this point that defendant began making incriminating statements.

¶ 70 Miranda testified that the gunshot residue test was not a real test but a ruse to "get" defendant to speak with them:

"APD: Now this GSR test that we're talking about, that was not a real test; that was not a real test; is that correct?

MIRANDA: Correct.

APD: That was basically a ruse to get [defendant] to speak to you?

MIRANDA: Correct."

From the time that defendant arrived at the Hanover Park police station until the time that he made incriminating statements was a total of six hours. At the beginning, defendant stated that he did not know that Rocio had been killed. During those six hours, defendant remained, "on and off," in the interview room with police officers around him. Miranda could not recall if defendant was placed in clothing other than the clothing that he arrived in.

¶ 71    The parties stipulated that the DVD with English subtitles which depicts the last approximately one hour of the interview was a true and accurate copy of defendant's statement during that portion of the interview. The State then moved it into evidence and rested. The defense rested without calling witnesses, and the trial court asked defendant if that is what he wanted and he indicated no:

"APD: Judge, at this time, we would rest as well.

THE COURT: You're not calling any witnesses?

APD: No, your Honor.

THE COURT: [Defendant], is that what you want? You don't want to testify on your behalf, correct?

DEFENDANT [through interpreter]: I want to testify.

THE COURT: I'm sorry?

DEFENDANT: I want to testify."

The APD responded: "it is my decision strategically not to call him. I told him this is not a trial. He has a constitutional right to testify at trial; however, this is not a trial." The trial court then asked the attorneys if they were prepared to argue, and they asked the trial court to review the DVDs prior to argument. The matter was then continued for argument.

¶ 72 The State argued that "[t]he testimony was that this high crime area called for the number of officers that were there" and that "no weapon was drawn past the initial" encounter. However, the only witness at the attenuation hearing who testified that he was at defendant's building on the night of the arrest was Detective Kirby, and he testified that the area was "a mixed residential business area" and that he was not aware of gang activity there. Kirby also testified that he did not know whether guns were drawn during the first 20 minutes because he was not there during that time.

¶ 73 In addition to arguing that the police conduct was not "egregious," the State argued that facts supporting a finding of attenuation included the fact that

police read defendant Miranda warnings and "confronted" him with the purported gunshot residue test.

¶ 74    In response, the defense argued: that the six hours between defendant's arrest and statement was not enough to purge the taint; that the Miranda warnings did not purge the taint because there was a lack of clear assent by defendant; that the police conduct was egregious where over 20 officers arrived and defendant was transferred from vehicle to vehicle; and that the use of a "phony GSR test" and repeated accusations of lying by the police also constituted egregious conduct by the police. In addition, the defense argued that defendant had not been confronted with "legally obtained information," as the appellate court had asked, because the fake GSR test did not qualify. *Hernandez*, 2013 IL App (1st) 1003447-U, ¶ 49 (this court had asked whether defendant had been confronted "with new legally obtained information" because that is "one possible intervening circumstance, which may produce a voluntary desire to confess and thus render the statement admissible"). The defense counsel also mentioned a discussion of the death penalty by the police and defendant shortly after defendant incriminated himself.[18]    The State

_____

[18] After defendant had already made incriminating statements, the written transcript indicates the following exchange occurred between defendant and the officers: "A. [Defendant]: Are you guys at least going to— Q. I don't understand. A. What's it called, when one is killed? Q. The death penalty. A. The death penalty. Q. That's not our thing. A. Oh no? Q. No that's not a decision we make."

34

objected immediately on the ground that this discussion was post-arrest and thus beyond the scope of the attenuation hearing, but the trial court overruled the objection.

¶ 75                    V. Trial Court's Attenuation Ruling

¶ 76          The trial court began its ruling by observing that "the purpose today is not to relitigate the motion to quash," since "the [a]ppellate [c]ourt already ruled that the fact that the police went and seized the defendant at his home on the 26th of November 2008, that that was a seizure.  And the [a]ppellate court already indicated that was an illegal arrest. *** [T]he [a]ppellate [c]ourt found that the arrest was done without probable cause and without a search warrant."

¶ 77          The trial court found that it was the fake GSR test which prompted defendant to confess:

          "[H]e did not admit to the murder.  And it wasn't until the police did a GSR, or a fake GSR, or however you want to look at it, and told him that the evidence that they had was that he fired the gun.  It wasn't until then that the defendant then admitted that, in fact, that he pointed the gun at the victim in this case just to scare her, and it accidentally discharged."

¶ 78          The trial court further found that the GSR test was a "strong intervening circumstance" and that "nothing else" prompted the confession:

"So during the statement and denying the fact that he shot the weapon at the victim, he was given a presumpti[ve] GSR test or a GSR test which the police indicated if [*sic*] he tested positive for gunshot residue. The Court believed that this is a very strong intervening circumstance that prompted the defendant to state what he stated [--t]he fact that he shot the gun after trying to scare her with the weapon and that it accidentally discharged.

In watching the video there is nothing else that would have prompted him to make the statement."

¶ 79    The trial court stated that, even when a confession is "obtained following an illegal arrest," the confession "may be admissible if it was sufficiently an act of the defendant's free will." After concluding that the confession at issue was an act of defendant's "own free will," the trial court stated: "I do note that the GSR statement made by the police prompted the defendant to come clean about shooting the weapon at the victim in this case. But I cannot say that this was exploitation in looking at the facts as I do, an exploitation of the illegal arrest." The facts which the trial court noted were: (1) the short duration of the interrogation, from 9 p.m. on November 26, 2008, until 2:45 a.m. on November 27, 2006; (2) the provision of Miranda warnings; (3) the cordiality of the conversation; and (4) the lack of handcuffs at that time. The trial court found

that "defendant not only understood the rights, but that he, in fact, agreed to speak to the police officers waiving those rights."

¶ 80    After ruling that the confession was attenuated, the trial court reinstated defendant's conviction and 55-year sentence.  On December 18, 2014, which was the same day as the trial court's ruling, defendant filed a timely notice of appeal.  This appeal followed.

¶ 81                              ANALYSIS

¶ 82    Defendant appeals the trial court's decision, arguing: (1) that the trial court erred in finding attenuation; (2) that his counsel at the attenuation hearing had a conflict of interest, since the appellate court permitted defendant on remand to address his claim that his trial counsel was ineffective for failing to move to suppress his statement as involuntary, and this same trial counsel continued to represent defendant on remand  (*Hernandez*, 2013 IL App (1st) 103447-U, ¶ 56 (permitting the parties " 'an opportunity to develop a factual record' " (quoting *Bew*, 228 Ill. 2d at 135)); and (3) that this counsel was ineffective for failing to move to suppress defendant's statement as involuntary (*Hernandez*, 2013 IL App (1st) 103447-U, ¶ 56 ("depending on what is entered into the record on remand, ineffectiveness *** could be addressed on direct appeal").

¶ 83        According to the trial transcript, the jury was never informed that the gunshot residue test, which the jurors watched on video, was a bogus test. Thus, the fake result of the fake test was part of the evidence that the jury considered when finding defendant guilty. We fail to see how falsely manufactured evidence can ever be due process. However, we do not need to reverse on that basis. Instead, we reverse, as we explain below, on the basis that was fully developed at the hearing held on remand, namely, attenuation.

¶ 84        For the following reasons, we reverse defendant's conviction, suppress the statement he made at the police station and remand for further proceedings consistent with this opinion.

¶ 85                                     I. Attenuation

¶ 86        Defendant argues that the trial court should have suppressed his confession at the police station because it was the product of his illegal arrest. As noted above, this court already found in a prior decision that defendant's arrest was illegal under the fourth amendment, since it was made without a warrant or probable cause. *Hernandez*, 2013 IL App (1st) 103447-U, ¶ 44; U.S. Const. amend IV.

¶ 87        However, the conclusion that a defendant's arrest was illegal under the fourth amendment does not automatically mean that his subsequent statement is suppressed. *People v. Jackson*, 374 Ill. App. 3d 93, 101, 104 (207); *People v.*

*Wilberton*, 348 Ill. App. 3d 82, 85 (2004); see also *People v. Johnson*, 237 Ill. 2d 81, 93 (2010). The question then becomes whether the statement was obtained by means sufficiently distinguishable from the illegal arrest such that we can say that the statement is purged of, or attenuated from, the taint of the original fourth-amendment illegality. *Johnson*, 237 Ill. 2d at 93; *Jackson*, 374 Ill. App. 3d at 101.

¶ 88    Attenuation analysis under the fourth amendment is distinct from the threshold question of voluntariness under the due process clause. *Jackson*, 374 Ill. App. 3d at 101. "[T]he voluntariness of a defendant's statements does not automatically purge the taint of an illegal arrest***." *People v. Franklin*, 115 Ill. 2d 328, 333 (1987). The absence of physical abuse or coercion, and the voluntariness of the statement, are merely threshold requirements for its admissibility. *Jackson*, 374 Ill. App. 3d at 105 see also *Franklin*, 115 Ill. 2d at 333. As a result, the fact that a trial court found no physical abuse or coercion does not resolve the issue of attenuation. *Jackson*, 374 Ill. App. 3d at 105; see also *Franklin*, 115 Ill. 2d at 333.

¶ 89                    A. Standard of Review

¶ 90    The parties disagree on the appropriate standard of review. Fortunately, we have a relatively recent supreme court case to guide us. In *Johnson*, 237 Ill. 2d at 93-94, as in our case, defendant moved to suppress statements that he had

made at a police station following an allegedly illegal arrest, and our supreme court considered the same issue that is before us, namely, attenuation. The court explained the appropriate standard of review as follows:

"In reviewing a trial court's ruling on a motion to suppress evidence, we apply the two-part standard of review adopted by the [United States] Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 \*\*\* (1996). *People v. Cosby*, 231 Ill. 2d 262, 271 (2008), quoting *People v. Luedemann*, 222 Ill. 2d 530, 542-43 (2006). Under this standard, we give deference to the factual findings of the trial court, and we will reject those findings only if they are against the manifest weight of the evidence. *Cosby*, 231 Ill. 2d at 271, quoting *Luedemann*, 222 Ill. 2d at 542-43. However, a reviewing court ' "remains free to undertake its own assessment of the facts in relation to the issues," ' and we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted. *Cosby*, 231 Ill. 2d at 271, quoting *Luedemann*, 222 Ill. 2d at 542-43." *Johnson*, 237 Ill. 2d at 88-89.

Thus, we apply a bifurcated standard of review: (1) rejecting a trial court's factual findings only if they are against the manifest weight of the evidence, (2) but reviewing *de novo* the trial court's conclusion as to whether those facts satisfy the legal standard to warrant suppression. *Johnson*, 237 Ill. 2d at 88-89;

*People v. Salgado*, 396 Ill. App. 3d 856, 860 (2009); *Jackson,* 374 Ill. App. 3d at 102; *People v. Clay*, 349 Ill. App. 3d 517, 523 (2004); see also *People v. Chambers*, 2016 IL 117911, ¶ 76; *People v. Pitman*, 211 Ill. 2d 502, 512 (2004).

¶ 91     A factual finding is against the manifest weight of the evidence only if the finding appears to be unreasonable, arbitrary, or not based on the evidence, or if the opposite conclusion is readily apparent. *Vaughn v. City of Carbondale*, 2016 IL 119181, ¶ 23; see also *In re M.I*, 2016 IL 120232, ¶ 21; *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50.

¶ 92     *De novo* review means that we perform the same analysis a trial court would perform.  *Condon & Cook, L.L.C. v. Mavrakis*, 2016 IL App (1st) 151923, ¶ 55.

¶ 93                              B. Attenuation Factors

¶ 94     The State has the burden of proving attenuation. *People v. Island*, 385 Ill. App. 3d 316, 339 (2008); *Jackson*, 374 Ill. App. 3d at 102; *Wilberton*, 348 Ill. App. 3d at 85; *Clay*, 349 Ill. App. 3d at 523.  To satisfy this burden, it must prove by clear and convincing evidence that the challenged evidence was obtained by means sufficiently distinguishable to be purged of the primary taint. *Island*, 385 Ill. App. 3d at 339; *Jackson*, 374 Ill. App. 3d at 102; *Wilberton*, 348

Ill. App. 3d at 85.  Clear and convincing evidence means evidence greater than a preponderance of the evidence but less than proof beyond a reasonable doubt. *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995); *Board of Trustees of University of Illinois v. Illinois Educational Labor Relations Board*, 2015 IL App (4th) 140557, ¶ 36; *In re R.G.*, 165 Ill. App. 3d 112, 134 (1988).

¶ 95        To determine whether a statement is attenuated from an illegal arrest, courts generally consider the following factors:  (1) the proximity in time between the arrest and the statement; (2) the presence of intervening circumstances; (3) the provision of Miranda warnings; and (4) the flagrancy of the police misconduct.  *Johnson*, 237 Ill. 2d at 93; *Jackson*, 374 Ill. App. 3d at 102; *Wilberton*, 348 Ill. App. 3d at 85; *Clay*, 349 Ill. App. 3d at 523.  Of these four factors, the presence of intervening circumstances and the flagrancy of the police conduct are the most important.  *Salgado*, 398 Ill. App. 3d at 860; *Jackson*, 374 Ill. App. 3d at 102; *Wilberton*, 348 Ill. App. 3d at 85; *Clay*, 349 Ill. App. 3d at 523.

¶ 96        Our supreme court has instructed that these four factors are to be "include[d]" in an attenuation analysis, suggesting that a court may consider other factors in an appropriate case.  *Johnson*, 237 Ill. 2d at 93.   " ' "It is hornbook law that the use of the word *including* indicates that the specified list *** is illustrative, not exclusive." ' " (Emphasis and ellipsis in original.) *People*

*v. Perry*, 224 Ill. 2d 312, 330 (2007) (quoting Bryan A. Garner, A Dictionary of Modern Legal Usage 431 (2d ed. 1995) quoting *Puerto Rico Maritime Shipping Authority v. Interstate Commerce Comm'n*, 645 F.2d 1102, 1112 n. 26 (D.C. Cir. 1981)).

¶ 97    For the purposes of our analysis, we accept the trial court's factual findings:[19]   (1) that the duration of the interrogation was short, lasting from 9 p.m. on November 26, 2008, until 2:45 a.m. on November 27, 2006; (2) that the gunshot residue test was the circumstance which prompted defendant's incriminating statements; (3) that, during the detention which followed the initial arrest, the officers' tone of voice was cordial and defendant was not handcuffed; and (4) that the officers provided Miranda warnings and defendant agreed to speak with them.

¶ 98                    1. Temporal Proximity

¶ 99    As to the first attenuation factor, our supreme court has observed that "the temporal proximity between the arrest and the statement is often an ambiguous factor, the significance of which will depend on the circumstances of the case, including the conditions under which the time passes." *Johnson*, 237 Ill. 2d at 93-94 (citing *People v. Morris*, 209 Ill. 2d 137, 160 (2004);

---

[19] In other words, even if we assume *arguendo* that the trial court's factual findings were not against the manifest weight of the evidence, we cannot find, applying a *de novo* standard of review, that these facts satisfied the State's burden of proving attenuation by clear and convincing evidence.

*People v. White*, 117 Ill. 2d 194, 223-24 (1987)); *Salgado*, 396 Ill. App. 3d at 866 ("an ambiguous factor"); *Jackson*, 374 Ill. App. 3d at 104; *Clay*, 349 Ill. App. 3d at 523 ("an ambiguous factor"). The ambiguity stems from the fact that, while a lengthy lapse of time may permit the accused "to reflect on his situation," a lengthy lapse of time may also enhance the coercive nature of a custodial setting. *Jackson*, 374 Ill. App. 3d at 104 ("the inordinate length" of defendant's 50-hour detention "weighs against attenuation"); *Wilberton*, 348 Ill. App. 3d at 86; see also *Salgado*, 396 Ill. App. 3d at 867 ("the lapse of time" is "a factor that cut[s] both ways").

¶ 100    Since, in the case at bar, the six-hour lapse of time was—as the trial court found—short, the duration did not permit independent, attenuated reflection (*People v. Austin*, 293 Ill. App. 3d 784, 788 (1997) ('[t]he mere passage" of five hours was "not sufficient to purge the taint of an illegal arrest)). Thus, we turn our focus to the remaining factors. *Wilberton*, 348 Ill. App. 3d at 86 ("our focus must be on the *** remaining factors" when this factor is ambiguous).

¶ 101                        2. Intervening Circumstances

¶ 102    The second factor, intervening circumstances, actually involves two separate considerations:   (a) whether the police had separate, "intervening probable cause" to justify the arrest (*Johnson*, 237 Ill. 2d at 94; *Wilberton*, 348 Ill. App. 2d at 87 ("Illinois courts repeatedly have found intervening probable

cause supports attenuation."")); and (b) whether there were intervening events which prompted or induced defendant's confession. *Jackson*, 374 Ill. App. 3d at 105.

¶ 103                                   a. Intervening Probable Cause

¶ 104          Concerning the first, our supreme court has held that intervening probable cause weighs heavily in favor of attenuation:

> " ' Had the officers decided at this time that defendant's initial detention was illegal, they could have released him and then, based upon the probable cause that developed independently of his initial arrest, immediately arrested him again. Under this scenario, there would be no question that defendant's statements and confession would be admissible. It follows, then, that the probable cause that would support a second arrest only minutes after defendant's first arrest also serves to break the causal connection between defendant's first illegal arrest and the statements ***.' " *Johnson*, 237 Ill. 2d at 94 (quoting *Morris*, 209 Ill. 2d at 159). See also *Wilberton*, 348 Ill. App. 3d at 87.

In the case at bar, the State does not argue that the police had any intervening probable cause between the time of defendant's arrest and his statement.

¶ 105                                          b. Intervening Event

¶ 106          In addition to providing probable cause, an intervening circumstance can

also be an event that prompts or induces a voluntary desire to confess, thereby

breaking the causal connection between the illegal arrest and the confession.

*Jackson*, 374 Ill. App. 3d at 105; *Wilberton*, 348 Ill. App. 3d at 86.  However,

"[i]t cannot be [1] something that was obtained illegally[, such as] statements

from unlawfully arrested codefendants," or [2] "information obtained by

exploiting the illegality of the defendant's detention," such as "a polygraph

examination conducted during the defendant's illegal detention."  *Jackson*, 374

Ill. App. 3d at 105; see also *Clay*, 349 Ill. App. 3d at 524 (a codefendant's

statement, which was suppressed as the product of police misconduct, cannot be

used as an intervening circumstance); *Franklin*, 115 Ill. 2d at 334 (defendant's

polygraph examination was "a form of interrogation" and thus his "willingness

to submit it" did not purge the taint of his illegal arrest; and the examination

itself was "a consequence of the illegal detention").

¶ 107          The trial court found that the bogus gunshot residue test was the event

that prompted defendant's incriminating statements, and the court's factual

finding is not against the manifest weight of the evidence.  Defendant

steadfastly maintained his innocence through the night and despite hours of

questioning but—as the State forthrightly admits in its brief—he confessed in under five minutes after the bogus test.

¶ 108    However, applying *de novo* review, we cannot agree with the trial court's legal conclusion that this event was an intervening circumstance that helped purge the taint of the prior illegal arrest. Like a polygraph examination, the bogus gunshot residue test was used, in this instance, as a form of interrogation, and it was also a consequence of the illegal arrest and the resulting detention. *Franklin*, 115 Ill. 2d at 334; *Jackson*, 374 Ill. App. 3d at 105. Similar to a codefendant's confession that was suppressed due to police misconduct (*Clay*, 349 Ill. App. 3d at 524), the bogus test was, itself, a form of misconduct. Thus, the bogus test cannot serve to purge the taint of the prior illegal arrest.

¶ 109    Our supreme court and this court have found that even a *validly given* polygraph test cannot be an intervening circumstance that purges the taint of an illegal arrest. *Franklin*, 115 Ill. 2d at 334; *Jackson*, 374 Ill. App. 3d at 105. In *Franklin*, after being informed that he had failed a polygraph test, defendant confessed, and our supreme court found that these valid test results did not purge the taint of his prior illegal arrest, and thus suppression of his subsequent confession was required. *Franklin*, 115 Ill. 2d at 334. If a valid test cannot purge the taint, then a completely bogus test certainly cannot.

¶ 110　　　　In an attempt to distinguish *Franklin* and *Jackson*, the State argues in its brief to this court that, "[o]f course, polygraph tests are unreliable and inadmissible." So is a bogus gunshot residue test.

¶ 111　　　　The State cites cases from the 1980's and early 1990's in which the police lied to defendants and the subsequent confessions were still admitted as voluntary under the due process clause. *E.g. People v. Melock*, 149 Ill. 2d 423, 450 (1992) (while deception weighs against a finding of voluntariness and is a relevant factor, it may be outweighed by a consideration of the totality of the circumstances).[20] However, voluntariness under the due process test is not the issue in front of us. The question here is: when a custodial bogus test is the primary event prompting a defendant's confession, does that bogus test purge the taint of a prior illegal arrest under the fourth amendment? As we already observed above, if a validly administered test does not purge the taint, a bogus test cannot possibly purge it.

¶ 112　　　　The State also argues that there were other intervening circumstances, prior to the gunshot residue test, which prompted defendant's confession.[21]

_____

[20] The State cites *People v. Holland*, 121 Ill. 2d 136, 154 (1987). However the supreme court concluded that it found "unconvincing defendant's contentions that [the officer]'s statement was false or misleading." *Holland*, 121 Ill. 2d at 155.

[21] The State acknowledges in its brief that the trial court ignored all these other alleged "intervening circumstances," and argues that we should review this part of the trial court's decision *de novo*.

First, none of this information caused defendant to confess. Although the police confronted him with other information, defendant steadfastly maintained his innocence, agreeing to both a lie detector test and a gunshot residue test to prove he was innocent. Second, this court has no idea whether the bulk of this other information was true, or bogus like the gunshot residue test.

¶ 113     As we observed above, the video depicted: (1) the police suggesting that Rocio's boyfriend had already identified defendant from a photo array;[22] (2) the police indicating to defendant that individuals named "Alejandro" and "Alfredo"[23] had separately told them that defendant had left his home before 7 p.m. on the night of the murder wearing a black hooded sweatshirt and that the two men knew it was before 7 p.m. because their soap operas had not yet started; (3) the police informing defendant that they had discovered a receipt in defendant's room which showed that defendant was at a market at 6:14 p.m. on the night of the murder and then showing defendant the receipt; (4) and the

---

[22] On the video, the police officers stated: "We – the Rocio's boyfriend, she was with him, when this happened. We showed him this. *** And whose picture do you think he picked out." They also stated: "Why do you think Rocio's boyfriend – he doesn't know you and you don't know him -- *** No and why would he – he doesn't know you. We didn't tell him who you were. We showed him this and who do you think he picked out?"

[23] In an earlier part of the video which the jury did not view, defendant stated that, on the night of the murder, he was with his two friends and roommates, Alejandro and Alfredo, for a portion of the evening. Defendant did not state their last names.

police performing a gunshot residue test on defendant's hands and informing defendant that the result was positive for the presence of gunshot residue.

¶ 114 However, none of these alleged facts were substantiated at trial. First, although the jury viewed the police indicating that Guzman, Rocio's boyfriend, had positively identified defendant, Guzman testified at trial that he did not observe the shooter's face. Second, although the jury viewed the police telling defendant that "Alejandro" and "Alfredo" had informed them that defendant had left his home before 7 p.m. wearing a black hooded sweatshirt, no one by either name testified at trial. Third, although the jury viewed the police informing defendant that they had discovered a receipt in his room showing that defendant was at a market at 6:14 p.m., no such receipt was introduced at trial. And last, but certainly not least, we now know that the gunshot residue test was a bogus test.

¶ 115 The fact that police confronted defendant with, which was substantiated at trial, was the fact that a gun holster had been found in defendant's vehicle. However, after being confronted with this fact, defendant did not confess for some time and, even after he did confess, he continued to maintain that this holster was not his. Confrontation with the fact of the holster discovery appears to have little to do with defendant's confession. As a result, we are not

persuaded by the State's argument there were other valid, intervening circumstances.

¶ 116    The State also argues in its brief, in one line, that the gunshot residue test was not a form of interrogation. " 'Interrogation' refers to express questioning, as well as to "any words or actions on the part of the police, other than those normally accompanying arrest and custody that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " *Jackson*, 374 Ill. App. 3d at 106 (quoting *People v. Olivera*, 164 Ill. 2d 382, 391-92 (1995)). The State admits elsewhere in its brief that "the test was certainly aimed at eliciting a confession." Since the test was completely bogus, there was no other reason for the police to administer it, except for their belief that it was " 'reasonably likely to elicit an incriminating response from the suspect.' " *Jackson*, 374 Ill. App. 3d at 106 (   quoting *Olivera*, 164 Ill. 2d at 391-92). Detective Miranda testified that the test was merely "a ruse to get [defendant] to speak" to them. *Supra* ¶ 70. Thus, the test was a form of custodial interrogation, which occurred during a detention that had been obtained solely through an illegal arrest. Far from purging the taint, the test exploited the illegality of the original arrest.

¶ 117    In conclusion, we find that the factor of intervening circumstances does not weigh in favor of attenuation.

¶ 118                              3. Miranda Rights

¶ 119       The third factor we must consider is the provision of Miranda warnings. Although police cannot dissipate the taint of an illegal arrest by simply giving Miranda warnings, the presence of warnings prior to an interrogation carries some weight. *Jackson*, 374 Ill. App. 3d at 102; *Wilberton*, 348 Ill. App. 3d at 85 ("the presence of the warnings prior to interrogation carries some weight" where "[s]ix times defendant waived his rights and agreed to give a statement"). See also *Johnson*, 237 Ill. 2d at 95 ("While the presence of Miranda warnings alone is not sufficient to purge the taint of illegality from a illegal arrest, it is a factor to be considered.").

¶ 120       In the case at bar, the trial court found that the police provided Miranda warnings. In addition, the trial court found that "defendant not only understood the rights, but that he, in fact, agreed to speak to the police officers waiving those rights."[24] However, the warnings occurred once at the very beginning of the six-hour interrogation and were not repeated, even after defendant asked what his rights were—immediately prior to the test. When the officers asked defendant if they had his "permission" to "check" his hands for gunshot residue, defendant replied: "what are my rights?" Instead of informing him of his

---

[24] Based on a review of the transcript alone, this court had concluded in our prior decision that defendant's " 'hmm-hmm' " responses failed to "reveal whether defendant affirmatively waived his rights." *Hernandez*, 2013 IL App (1st) 103447-U, ¶ 47.

rights, one of the officers stated: "I'm asking you. If you don't want it we won't do it." Thus, applying a *de novo* standard of review to the trial court's factual finding, we conclude that the Miranda warnings carry some weight but not much under the circumstances of this case.

¶ 121                    4. Flagrancy of the Police Misconduct

¶ 122     In determining whether a statement was the product of an illegal arrest, we consider lastly the flagrancy of the police misconduct

¶ 123     With respect to this fourth factor, our supreme court has explained that police misconduct is flagrant when it is carried out in such a manner as to cause surprise, fear, confusion, or when it has a quality of purposeful or intentional misconduct. *Johnson*, 237 Ill. 2d at 94; *People v. Foskey*, 136 Ill. 2d 66, 86 (1990); *Jackson*, 374 Ill. App. 3d at 107; *Wilberton*, 348 Ill. App. 3d at 89.

¶ 124     The trial court found that the officer's tone during the detention following the initial arrest was cordial, and that defendant was not handcuffed during the ensuing detention. However, the trial court did not consider the flagrancy of the police misconduct during the initial arrest, when over 20 officers arrived at defendant's residence and handcuffed him. *Hernandez*, 2013 IL App (1st) 103447-U, ¶ 7 ("Approximately 24 officers," some with "their weapons drawn" arrived at defendant's residence.)

¶ 125    In the case at bar, the State introduced no evidence at the attenuation hearing concerning the initial arrest, and the trial judge repeated several times that he was not the judge who heard the original suppression motion and hearing.

¶ 126    The only witness at the attenuation hearing who testified that he was at defendant's building on the night of the arrest was Detective Kirby. Defendant was already in handcuffs and being walked to Kirby's vehicle in the company of two to three other officers, when Kirby first saw him. Kirby was not asked whether this was a high-crime area, but he did testify that it was "a mixed residential business area" and that he was not aware of gang activity there. Kirby was not asked what prompted so many officers to arrive on the scene, and he did not know whether any of these officers had drawn their guns during the 20 minutes when the initial arrest occurred.

¶ 127    Detective Kirby and Fernandez's testimony did establish that defendant had been speaking with only one or two officers over the phone prior to his arrest and then, suddenly, over 20 officers appeared at his home. The appearance of so many unexpected officers certainly has the potential "to cause surprise, fear and confusion." See *Johnson*, 237 Ill. 2d at 94.

¶ 128    Although the trial court found that the officers' tone was cordial during the ensuing detention, "[t]he apparent purpose of the defendant's arrest and

detention was to enable the police to conduct an expedition for evidence in the hope that something might turn up, a practice that the Supreme Court has condemned." *Franklin*, 115 Ill. 2d at 335. See also *Clay*, 349 Ill. App. 3d at 525 ("police act with an improper purpose when they arrest persons as part of an expedition in the hope of developing probable cause"). The officers repeatedly told defendant he was lying and confronted him with a bogus test in order to induce him to confess. *Franklin*, 115 Ill. 2d at 335 ("The detention was a continuing violation."). The officers lacked probable cause at the time of defendant's arrest and were on an expedition to find it. Detective Miranda conceded that the test was merely "a ruse to get [defendant] to speak" to them. *Supra* ¶ 70. Thus, this factor does not help the State meet its burden of showing clear and convincing evidence of attenuation. *Clay*, 349 Ill. App. 3d at 525 (finding a lack of attenuation where the "police arrested defendant on a fishing expedition for evidence").

¶ 129    In sum, after having reviewed all the factors, we conclude that the statement was not attenuated from the taint of the illegal arrest, (1) where the duration between the illegal arrest, as found by the trial court, was short and thus did not provide time for independent reflection; (2) where the event that prompted the confession, as found by the trial court, was the bogus gunshot residue test, and it did not qualify as an intervening circumstance purging the

55

taint of the illegal arrest, since it was itself a form of interrogation occurring as a consequence of the illegal arrest and a form of misconduct; (3) where Miranda warnings were provided once at the start of the six-hour interrogation but were not repeated again, even when defendant specifically asked what his rights were; and (4) where the State introduced no evidence at the attenuation hearing concerning the circumstances of the initial arrest, and thus the trial judge, who had not presided at the original suppression hearing, had no information on which to determine whether or not the initial illegality constituted egregious police conduct, and where the police were on a fishing expedition during the subsequent detention.

¶ 130      As we discussed above, in addition to the four factors that our supreme court specifically listed, we may consider additional, relevant factors. *Supra* ¶ 96. Further supporting our holding is the fact that we cannot condone the manufacture of false evidence by the police—namely, the false positive result to a fake test—which was then presented to the jury during the playing of the video.

¶ 131      For the foregoing reasons, we conclude that the statement was not attenuated from the illegal arrest and must be suppressed under the fourth amendment.

¶ 132     Next, we must consider whether we may remand for a new trial. We cannot remand for retrial if the State failed to present other evidence sufficient to support a conviction.  See *Clay*, 349 Ill. App. 3d at 526.  Otherwise we run afoul of double jeopardy. *Clay*, 349 Ill. App. 3d at 528.  In determining whether to remand the case, this court must consider all of the evidence presented at the trial, even if the court erred by admitting some of it. *Clay*, 349 Ill. App. 3d at 526 (citing *People v. Avery*, 180 Ill. App. 3d 146, 157 (1989).

¶ 133     Here the evidence admitted at trial included: (1) the boyfriend's testimony that the murderer was wearing a black sweatshirt; (2) a police officer's testimony that he discovered some burnt black clothing near the rear garage door of defendant's building; (3) the bouncer's testimony that he observed defendant's vehicle parked near the murder scene, shortly before the murder;[25] (4) an officer's testimony that he discovered multiple small broken-glass fragments on the driver's side front-seat floor mat of defendant's vehicle and a gun holster on the center console hump; (5) testimony by a police officer that the victim's driver-side window was shattered, and testimony by an evidence technician that there were glass fragments in her hair; and (6) evidence of a

---

[25] David Carlson testified that he observed a truck near the murder scene on November 25, 2008, at 8 p.m. and Detective Hugo Villa testified that he responded to a call concerning the victim's death at 8:11 p.m.  Carlson testified that he later picked out the same truck on his own in the police parking lot.

possible motive based on the recent break-up of a long-term romantic relationship between defendant and the victim,[26] and the victim's murder while in the company of her new boyfriend.

¶ 134    The glass fragments found in defendant's vehicle are significant because the gunshot shattered the window of the victim's vehicle, spraying glass fragments into the victim's hair.  Based on this evidence, one could argue that the glass fragments also sprayed on to defendant at the time of the shooting and then dropped of his clothes when he entered his own vehicle.  The burnt black clothing found outside of defendant's building is significant, because the victim's boyfriend testified that the shooter wore a black hoodie, and the attempted destruction of the clothing arguably indicates an awareness of guilt.  The bouncer's testimony that defendant's vehicle was parked near the murder scene at the time of the murder is significant because the bouncer was unrelated and appeared to have no motive to lie.  The summary execution of the victim in front of her new boyfriend certainly suggests a motive; and the gun holster found in defendant's vehicle and the presence of the vehicle near the crime scene indicates both opportunity and means.

¶ 135    Based on this evidence, we reverse and remand for a new trial and proceedings consistent with this opinion.

---

[26] At trial, Jose Munoz testified that his sister Rocio, the victim, had dated defendant for three or four years, until six months before she died.

¶ 136                                II. Conflict

¶ 137        In addition to the attenuation issue, defendant claims on this appeal: (1) that his counsel at the attenuation hearing had a conflict of interest, since the appellate court permitted defendant on remand to address his claim that his trial counsel was ineffective for failing to move to suppress his statement as involuntary, and this same trial counsel continued to represent defendant on remand  (*Hernandez*, 2013 IL App (1st) 103447-U, ¶ 56 (permitting the parties " 'an opportunity to develop a factual record' " (quoting *Bew*, 228 Ill. 2d at 135)); and (2) that this counsel was ineffective for failing to move to suppress defendant's statement as involuntary (*Hernandez*, 2013 IL App (1st) 103447-U, ¶ 56 ("depending on what is entered into the record on remand, ineffectiveness *** could be addressed on direct appeal").

¶ 138        On April 3, 2014, prior to the attenuation hearing, defendant requested new counsel in open court, stating that his counsel "doesn't want to bring [to] the Judge's attention some important points or issues that I believe is for my defense."  The trial court did not inquire what the points or issues were, so we do not know whether they related to defendant's claim, on his prior appeal and on this appeal, that his counsel was ineffective for failing to move to suppress his statement as involuntary.

¶ 139        In addition, at the end of the attenuation hearing, defendant informed the trial court that he wanted to testify at the attenuation hearing, and his counsel would not allow him to do so. We have no idea what defendant wanted to testify to and whether it related to his ineffectiveness claim.

¶ 140        Since we are reversing and remanding based on the attenuation issue, we do not need to reach defendant's claims that reversal is also warranted on the grounds that his counsel had a conflict at the attenuation hearing and that his counsel was ineffective. However, on remand, we direct the trial court to appoint new counsel.

¶ 141        The special concurrence in this case accuses the victim's boyfriend of being a murderer (*Supra* ¶¶ 29-30) after a jury found defendant guilty of the crime he confessed to. We threw the confession out and find defendant should receive a new trial. The special concurrence disagrees based on the justice's view of the evidence, but finds that the victim's boyfriend is the murderer.

¶ 142        A person accused of a crime is presumed innocent until proven guilty beyond a reasonable doubt. The accused is afforded certain rights under our federal and state constitutions. When the State accuses someone of murder, it is normally done in an indictment by a grand jury. The accused is appointed a lawyer to defend him when he cannot afford one, and the accused is given his day in court to argue his innocence to a jury of his peers.

¶ 143    In this special concurrence, the boyfriend was afforded no protections. He was indicted, tried, and convicted in the special concurrence. He has no right to appeal and will be given no opportunity for clearing his good name.

¶ 144    The question before this court was whether there was sufficient evidence such that a rational juror could have convicted the defendant, without the tainted evidence. It was not our job to attempt to prosecute someone else, based on a cold record. Nonetheless, the special concurrence states that "all reasonable inferences" "establish" that the boyfriend is "a viable suspect," and she finds his testimony not credible, although she never heard him testify. *Supra* ¶¶ 29-30. The special concurrence states repeatedly that the boyfriend offered no aid to the victim (*supra* ¶¶ 29-30), although he immediately left to ask someone to call the police and an ambulance, and then returned to hold the dying woman in his arms. *Supra* ¶ 14. The special concurrence concludes that his "behavior was not that of a reasonable person." *Supra* ¶ 30. This is a highly unusual special concurrence.

¶ 145                              CONCLUSION

¶ 146    For the foregoing reasons, we reverse and remand for a new trial.

¶ 147    On a prior appeal, we found that defendant's arrest was illegal, and vacated defendant's conviction and remanded for an attenuation hearing. On remand, the trial court conducted the attenuation hearing and concluded that

defendant's statement was attenuated from the illegal arrest, and the case came back to us on appeal after the hearing.

¶ 148    This opinion concludes: (1) that defendant's statement was not attenuated from an illegal arrest; and (2) that the State presented sufficient other evidence such that a retrial does not violate the double jeopardy clause. Justice Lampkin agrees with the first conclusion but disagrees with the second; and Justice Reyes agrees with both conclusions. Thus, our conclusion is unanimous with respect to the first conclusion, and a majority of justices agree with the second conclusion. As a result, this court reverses and remands for a new trial.

¶ 149    Reversed and remanded.

¶ 150    JUSTICE REYES, specially concurring.

¶ 151    I completely concur in the majority's decision; however, I see no need to respond to the dissent.

¶ 152    JUSTICE LAMPKIN, concurring in part and dissenting in part.

¶ 153    I agree with the majority that defendant's statement was not obtained by means sufficiently distinguishable to be purged of the primary taint of his illegal arrest. See *People v. Lovejoy*, 235 Ill. 2d 97, 130 (2009) (where a defendant was illegally detained, the court must determine whether a subsequent statement bears a sufficiently close relationship to the underlying illegality by considering whether the evidence was obtained "by means

sufficiently distinguishable to be purged of the primary taint" of illegality). Therefore, his statement and any further evidence flowing from his illegal arrest must be suppressed.

¶ 154     I would add to the attenuation analysis the following. I do not agree that the giving of *Miranda* warnings should be given any weight in this case. Defendant never answered out loud that he understood the *Miranda* warnings and then, when asked if he would speak to the police officers, there was a lack of clear assent by defendant to talk with them. Furthermore, when one officer left the interview room and another officer arrived, defendant was not given *Miranda* rights again, which could have provided an opportunity to demonstrate that he understood his rights and that he was willing to talk to the new officer who then participated in the discussion. *People v. Scott*, 366 Ill. App. 3d 638, 646 (2006) (while apprising a defendant of his *Miranda* rights on multiple occasions alone is not sufficient to purge defendant's statement of the taint of his unlawful arrest, this factor obviously weighs in favor of a finding of attenuation).

¶ 155     I also disagree with the trial court's factual findings and the majority's adoption of the finding that the officer's tone was "cordial." In the last hour of defendant's interrogation, the officers repeatedly raised their voices when speaking to defendant, repeatedly talked over him when he was trying to answer

questions, and called him a liar no less than 20 to 30 times. They also accused him of lying in front of God. Defendant was seated in a small room with a small table in front of him and his back to the wall. An officer was sitting next to defendant, facing him and, at times, their faces were less than two feet apart. Another officer sat on the other side of the table, no more than three to four feet from defendant. Defendant was basically pinned in a corner. This certainly was not a "cordial" environment.

¶ 156    I next must dissent with the majority's opinion that the State presented sufficient evidence to support a conviction for first degree murder and, in my opinion, remand would subject defendant to double jeopardy. See *People v. Cabrera*, 402 Ill. App. 3d 440, 446-47 (2010) ("[t]he prohibition against double jeopardy is designed to prevent the State from engaging in more than one attempt to convict an individual, thereby subjecting him to embarrassment, expense, continuing anxiety and insecurity, and increasing the possibility that he may be found guilty even if innocent. [Citation.] It also furthers the constitutional policy in favor of finality for the benefit of the defendant. [Citation.]")  I would, therefore, reverse his conviction outright.

¶ 157    The evidence for purposes of double jeopardy is set out below. I have combined the direct and cross-examination of witnesses to give the reader a clearer picture of the facts.

¶ 158        Jose Munoz, the brother of Rocio, testified that she lived with her three brothers in Elgin at the time of her death on November 25, 2008. They had lived there for three years. Rocio knew defendant in Mexico. Jose did not. She had been in the United States since 2005. For three or four years, she had been in a relationship with defendant. Jose had seen them together once at a dance. According to Jose, Rocio and defendant had stopped dating six months before her death.

¶ 159        On the date in question, Rocio worked at Elvira's Hair Salon in Hanover Park on Irving Park Road. She had worked there every day in the afternoon for 6 to 8 months. On November 25th, she was in a relationship with Rafael Delatorre Guzman. Contrary to the majority's statement of facts, there is no indication whatsoever in the record of how long she and Guzman were dating. In fact, in the now suppressed video interview of defendant, police repeatedly told defendant that Rocio was seeing another man who they had spoken with for two hours. The police informed defendant that man (presumably Guzman) told them that he had been dating Rocio for two to three years, that he loved her, and that they were talking about living together and getting married.

¶ 160        On November 25, 2008, Guzman drove to Rocio's place of employment in his car and parked in front of Los Arcos supermarket, which was in the same shopping center as the salon. He went into the salon. At 8 p.m., Guzman and

Rocio left the salon together to go to dinner. Rocio's car was parked in front of the salon.[27] Rocio got into her car on the driver's side. Guzman waited on the passenger side while Rocio moved some bags from the passenger seat to the rear of her car.

¶ 161    As he stood there waiting, Guzman saw someone walking in front of Rocio's car on the sidewalk. Guzman was looking in the car when he saw the individual. The individual was about 6 feet tall and weighed about 184 pounds.[28] According to Guzman, the man wore a black hooded sweatshirt. He thought the hood was on the man's head.[29] He could not see his face. Guzman said he was "talking to a girl," who he identified as Rocio, and "ignored" the man. He was not paying attention to what the individual on the sidewalk was doing. Rocio said "you can get in the car" and, as he was getting in the car, he heard a shot. He did not see the shot. At that time, Guzman "just saw Rocio move," and he "got out of the car" and went inside Los Arcos supermarket. As he "was reaching the store," Guzman turned his face to see where the person with the hooded sweatshirt was located. Guzman "saw him walking on the

---

[27] Photos depict Rocio's car, parked with the front end of her vehicle facing the curb, at a right angle to the curb. In other words, the front of her car faces the curb, then there was a grassy area and then there was a sidewalk immediately adjacent to the grassy area.

[28] No evidence was introduced as to defendant's height or weight.

[29] Guzman did not testify that the sweatshirt had a zipper.

sidewalk," going away from the car. When asked a second time what the person was doing, Guzman said he was "walking." Guzman said that he did not see anyone else in the strip mall, he did not recognize the person that was walking, and it "all happened very quickly." Once inside the store, the police and an ambulance were called. When the police arrived, Guzman accompanied the police back to the car where he made certain observations of Rocio that need not be repeated here. He also testified that when he reached the car he grabbed Rocio and lifted her up to see how she was. He spoke to her and "was moving her." Rocio did not respond.

¶ 162   By stipulation, it was agreed that Rocio died of a gunshot wound to the head behind her left ear. Dr. Kendall Crowns performed the autopsy. The course of the gunshot wound was from the back of the head to the front and from the left side of the head to the right. Dr. Crowns "recovered a deformed medium caliber lead bullet from behind the right eye and a deformed brass jacket fragment from the interior right frontal lobe of the brain."

¶ 163   As described by the first officer to arrive on the scene, Hugo Villa of the Hanover Park Police Department, the area where the shooting occurred is a shopping center that is well lit, with lighting coming from the parking lot and from Irving Park Road. He pulled into the parking lot. The parking lot, as well as the sidewalk, is adjacent to Irving Park Road. Officer Villa made the

following additional observations. He received a call at 8:11 p.m. that took him to 1814 Irving Park Road, a shopping center. There were 10 to 15 stores in the shopping center. Ten to fifteen people were outside a grocery store huddled at the doorway when he arrived. He described his observation of Rocio (which need not bear repeating) and of the surrounding area. Rocio's driver's side car window was shattered and had a partial hole in it.[30] Glass was everywhere, including on Rocio's body and in her hair. It appeared to be automobile glass. There was a bag containing clothing on the passenger's seat.[31] One spent shell casing was observed within one or two feet of the driver's side door. Officer Villa was not able to determine the caliber of the casing. Both car doors were closed when he arrived.

¶ 164    According to Officer Edgardo Lopez of the Hanover Park Police Department, on November 25, 2008, he received a call that took him to the Hanover Park Police Department where he had a briefing with several detectives assigned to MCAT. On November 26, 2008, Officer Lopez and other officers were assigned to locate defendant in Aurora. They set up surveillance positions of the home of defendant's uncle. Defendant called them in response to the police putting out the word that they were looking for him. Defendant

[30] A photo captures the shattered driver's window and the bullet hole.

[31] A photo depicts the bag on the seat.

68

directed the police to his location while on the phone. When they arrived at defendant's address in Aurora, defendant was standing outside an apartment building still talking on a phone to Officer Lopez in Spanish. Lopez described the building as the "type of building that had a business on top and apartments on the bottom to the rear." Other officers on the scene approached defendant and started transporting him to the Hanover Park Police Department before Lopez got to him. Defendant did not run, fight, or try to resist the police.

¶ 165  David Carlson, a bouncer at Bungalow Joes bar, testified as follows. He arrived at work at 4 p.m. on November 25, 2008. Bungalow Joes is positioned fifteen feet off of Irving Park Road, near the intersection with Jensen Boulevard. At the corner of Irving and Jensen is a gas station and then a Spanish grocery store. The shopping center where Rocio was killed is about a football field away from where Carlson works. A little after 4 p.m., as Carlson was outside the bar, twenty-five feet from the front door smoking a cigarette, he saw an F150 pickup truck "where the back wheels are, the wheel wells are flared out" parked on Jensen another twenty-five feet from him. When asked what color it was he said "[b]lack, or it could have been blue." The truck was sitting on Jensen between the gas station and the Spanish grocery store.

¶ 166  At 4 p.m., it was light outside. Carlson said "I didn't see the license plates or anything." There were also pedestrians and traffic on the street.

Nothing was unusual about the truck. There was no damage to it and no insignia. He did not "see a license plate or anything," nor did he see anyone in or around the truck. He was smoking for about five minutes. He then went back inside to work.

¶ 167     Carlson saw the truck again at about 8 p.m. when he exited the bar. It was dark that evening. He said he saw "over in the retention pond an officer with two gentleman on the ground, possibly at gunpoint." The retention pond was on the other side of the truck. When he went back inside the bar, the truck was still sitting there. He did not see what happened with the individuals by the retention pond before going back into the bar. There were also traffic and pedestrians on the street. No one was in or around the truck. He was not a witness to any shooting that evening, nor was he aware that a shooting took place that evening. The next day, November 26, 2008, when he returned to work, he observed a picture of the Ford F150 behind the bar. He did not know where that picture was taken. After seeing the photo, Carlson called the Hanover Park Police Department to tell them that he had seen that truck.

¶ 168     On December 2, 2008, police came to Carlson's residence. He accompanied the police to the Hanover Park police station and there he saw the Ford F150 parked on their lot. Carlson said "that's the truck that was parked on Jensen." He also identified a series of photographs that depicted the area where

the F150 had been parked on November 25th in relationship to the grocery store and the gas station.

¶ 169        Lisa Koenen, an evidence technician, went to St. Alexius Medical Center where Rocio had been transported. She photographed the deceased and collected evidence. The technician moved Rocio's hair and four pieces of glass fragment fell from her hair onto the hospital bed. The glass fragments were photographed. She identified a photo depicting the glass fragments on the bed. There was no testimony that the actual glass fragments were collected nor was there testimony that they were introduced into evidence for the jury to observe. The same technician additionally recovered "a fragmented projectile" from Dr. Crowns.

¶ 170        Koenen also went to 559 High Street in Aurora, defendant's residence, on November 26, 2008, at 8:30 p.m. and took photographs of the building, which was repeatedly identified as 556 High Street. A truck was parked on the side of the apartment building. Koenen photographed the outside of the truck. Looking through the window of the truck, the technician saw a black plastic holster for what she believed was from an automatic gun located "underneath

the front passenger seat"[32] of the vehicle. No photograph was taken of the gun holster.

¶ 171     By stipulation, the parties agreed that: (1) a 1999 Ford F150 vehicle, plate 77536N was registered to Jose M. Hernandez in Aurora, Illinois; (2) Jose Hernandez is defendant's uncle; (3) Jose Hernandez was listed as the registered owner of the dark blue Ford F150 truck in order to assist defendant with the purchase of the vehicle; and (4) Jose never used the truck, never drove the truck, and the truck belonged to defendant.

¶ 172     Jose would also testify that Hanover Park police officers contacted him on November 27, 2008, requesting his consent to allow them to search the truck. He was presented with a written consent to search form, and he agreed to allow the police to search the truck. The consent to search form was signed on November 27, 2008, at 12:25 a.m.[33] This evidence would be inadmissible on retrial and will be discussed later.

¶ 173     Thomas Todd, a forensic technician from the Schaumburg Police Department, was assigned to process a blue Ford F150 on November 28, 2008,

---

[32] This testimony differs from where the photographs depict the holster and where the recovering technician stated the holster was recovered.

[33] The timing of this is significant because the police already knew at the time they sought Jose's consent that the truck belonged to defendant. Defendant told the police what kind of truck he had, where it was located, and then he refused to give consent to search his truck. This occurred on November 26, 2008, by 10:00 p.m. per the transcript of his videotaped interview.

at the Hanover Park Public Works garage at 2121 East Lake Street. When he saw it, the vehicle was locked. The vehicle was opened (no testimony was presented as to how they opened defendant's vehicle) and inside was a black plastic gun holster, "on the front seat floor about the center console area above the hump between the seats."[34] Todd testified that the gun holster appeared to be for an automatic weapon based on its shape and the lack of an area for a cylinder for a revolver. There was no testimony as to why this information was relevant. He also saw some "small glass fragments, like broken glass fragments" on the driver's side front seat floor mat. The fragments were photographed and collected. Although photographs of the "fragments" were shown to the jury, the actual collected fragments were not. Todd recovered the plastic holster and a pair of women's underwear from the hump.

¶ 174     On November 29, 2008, a sergeant with the Hanover Park Police Department went to 559 High Street in Aurora, near a rear garage door of the residence. He observed "what appeared to be burnt clothing," which included a partial zipper and some "plastic or cloth" material. It was photographed and collected by his partner. The materials were recovered on a concrete slab right in front of the garage door.

---

[34] This is where a photograph actually depicts the location of the holster along with a pair of women's panties and other items. This was People's Exhibit 47.

¶ 175        In December 2008, this same officer drove to David Carlson's home, picked up Mr. Carlson, and transported him to the police station and to Bungalow Joes bar where photos were taken of the police vehicle parked less than a block from 1811 Irving Park Road. According to the officer, Bungalow Joes is less than a block from 1811 Irving Park Road.

¶ 176        A portion of defendant's videotaped statement was then played to the jury, which we have now ruled was admitted erroneously.

¶ 177        The jury then heard the testimony of Alvaro Fernandez, a police officer from Hoffman Estates, who spoke with defendant on November 26, 2008, at 9 p.m. in the interview room and then accompanied defendant to several locations on November 27th. All of his testimony would now be inadmissible as fruit of the poisonous tree. See *People v. Clay*, 349 Ill. App. 3d 517, 524-25 (2004).

¶ 178        Based on the evidence, I do not believe the standard has been satisfied to remand this cause for a new trial. In other words, I find the evidence introduced at trial was legally insufficient to convict defendant and, therefore, defendant will be subject to double jeopardy upon retrial. *People v. Olivera*, 164 Ill. 2d 382, 393 (1995).

¶ 179        Primarily, my conclusion is based on the fact that there is no direct evidence of defendant's guilt. The circumstantial evidence demonstrated that defendant and Rocio dated for three to four years, but ceased dating about six

months prior to her death. There was no testimony regarding the terms of their separation and nothing establishing there were ill feelings between them. In addition, there was no evidence demonstrating when Rocio and Guzman became a couple. In short, there was nothing to establish defendant's motive at the time of Rocio's death. In fact, there is no evidence whatsoever that defendant knew Rocio was dating anyone after their separation.

¶ 180    In contrast, after reviewing Guzman's testimony, the evidence and all reasonable inferences drawn therefrom establish him as a viable suspect. Guzman testified that he was standing at the passenger door outside of Rocio's vehicle, which was parked facing a curb, in front of which was a grassy area and then a sidewalk. While Rocio allegedly removed packages from the passenger seat, Guzman observed an individual wearing a black hoody walking on the sidewalk in front of Rocio's car. After Rocio instructed Guzman that he could enter her car, Guzman reported hearing a gunshot. Guzman stated that Rocio's body moved and he exited the car. Guzman's testimony does not mimic that of a reasonable person under the circumstances. Immediately after hearing the gunshot, there was no testimony that Guzman looked around in an attempt to (1) identify the shooter or (2) protect himself from additional danger. Guzman did not provide any aid to Rocio, the woman he was dating, nor did he even check to see if she was hurt. Moreover, Guzman did not report hearing,

feeling, or seeing the glass shatter from the window where the bullet entered the vehicle. Photographs and testimony clearly establish that glass was shattered inside the vehicle and onto Rocio from the driver's side window. Instead, Guzman exited the vehicle, which photographs demonstrated a large shopping bag positioned on the front passenger seat despite his testimony that Rocio had him wait outside the car while she moved the packages to the rear seat, and walked to Los Arcos supermarket. Guzman instructed individuals in the market to call the police and an ambulance even though he provided no testimony that he knew Rocio had been shot. Notably, Guzman's car was parked in front of the Los Arcos supermarket and a trier of fact could reasonably infer that he placed the murder weapon in the car prior to entering the market.

¶ 181        Additionally, Guzman testified that, as he reached Los Arcos, he turned and observed the man that had been walking earlier. The man was still walking on the sidewalk. This is notable for a number of reasons. First, it is not reasonable to believe that an individual who had just fired a handgun into a car parked in a well-lit shopping center would casually walk on a sidewalk. Also, in order for the individual walking to have been the shooter, the individual would have had to move from the sidewalk, walk through a swath of grass, and into the parking lot in order to position himself toward the rear of Rocio's car. This is because the evidence demonstrated that Rocio was shot through her driver's

side window and the bullet entered the back of her head, behind her left ear. Guzman, however, never testified to observing the individual leave the sidewalk. If that person was the shooter, he would have had to then go back over the curb and the grassy area to get back on the sidewalk, yet Guzman saw none of this. This certainly supports the theory that the man on the sidewalk was not the shooter. In addition, Guzman did not testify that the hoody worn by the individual contained a zipper, which is significant because the police recovered a zipper in the pile of burnt material in the garage area behind defendant's address. Finally, despite providing no protection or aid to Rocio immediately following the shooting, Guzman accompanied the officers upon their arrival to Rocio's vehicle. At that time, Guzman grabbed Rocio and lifted her up. Guzman's behavior was not that of a reasonable person under the circumstances.

¶ 182    Furthermore, the remainder of the trial evidence did not support defendant's guilt. The evidence was riddled with inconsistencies and inexplicable circumstances. For example, according to Carlson, defendant's Ford F150 truck was parked outside Bungalow Joes bar, about 25 feet away, for over four hours prior to the shooting. The truck was situated between a gas station and a grocery store with traffic and pedestrians moving about. Carlson, however, could not be sure of the truck's color and did not see the license plates

despite it being light outside when he initially observed the truck; he never observed anyone enter or exit the truck; he testified there was nothing unusual about the truck; and he failed to identify the year of the truck. Notwithstanding, Carlson testified that he again observed the truck parked in the same location between the gas station and the grocery store at 8 p.m., just before the shooting. It is important to note that Bungalow Joes is located approximated 120 yards away from the shopping center where Rocio worked and was killed. Therefore, a rational trier of fact would need to reasonably infer that defendant parked his truck in the daylight, near an intersection containing a functioning gas station and grocery store, within 25 feet or more of a functioning bar, and waited either in the truck for four hours or exited and hid somewhere until Rocio was scheduled to leave work at 8 p.m. According to this version of the events, defendant would have had to walk the 120 yards from the truck to the shopping center parking lot in order to shoot Rocio. And, although Carlson never identified anyone in or around the parked F150, he did testify to observing two men on the ground in a retention pond possibly being held at gunpoint by a police officer. Simply stated, Carlson's testimony was implausible and insufficient.

¶ 183     Additionally, there were a number of unexplained inconsistencies in the physical evidence. First, the stipulated testimony of Dr. Crowns established that

*a* bullet and *a* brass jacket were recovered from Rocio's head; however, the photograph admitted into evidence displayed four bullet-related items. Next, Koenen, the evidence technician, observed four pieces of glass fragment fall from Rocio's hair; however, the photograph admitted into evidence showed only two glass fragments. Moreover, the stipulated testimony provided that the glass fragments were collected; however, they were not admitted into evidence. In addition, the second evidence technician, Todd, photographed the interior floor of defendant's truck displaying hundreds of rock-like objects and a few shard-like objects that could be plastic or glass. It is clear from the photograph that the shape and thickness of the shard-like objects on the floor of defendant's truck are different from the photographed glass fragments that were in Rocio's hair. However, the shard-like objects recovered from defendant's truck were not shown to the jury. The jury, therefore, was unable to compare the actual items recovered from Rocio's hair to those recovered from the floor of defendant's truck.

¶ 184     There also was conflicting testimony regarding the location of the holster within defendant's truck. Koenen, the first evidence technician to view the truck, reported that the holster was underneath the front passenger seat. Despite having knowledge that a shooting had occurred and having access to a camera, Koenen did not photograph the holster. Two days later, Todd inexplicably

managed to open the locked truck and observed a plastic holster, along with a pair of white women's underwear, which were never mentioned by Koenen. According to Todd and the photographs he took, the plastic holster and underwear were located on the "hump" between the driver and passenger, near the center console area. The holster was not underneath the front passenger seat as reported by Koenen. Critically, the November 27, 2008, recovery of the holster and shard-like objects in defendant's truck would be inadmissible evidence on retrial because Jose Fernandez's consent to search was invalid where the police knew at the time they obtained the consent that Jose lacked authority to provide such consent and defendant had denied consent. See *People v. Bochniak*, 93 Ill. App. 3d 575, 576-77 (1981) ("the authority which justifies third-party consent rests on the mutual use of the property by persons generally having joint access or control for most purposes").

¶ 185    Finally, the evidence regarding the zipper recovered from the garage area behind defendant's apartment is contradictory and unexplained. Koenen observed defendant's truck at his address on November 26, 2008, but never reported observing remnants of a burnt object or partial zipper. Furthermore, police searched his car on November 27 and there is no mention of seeing any burnt material then. It was not until November 29, 2008, that the police observed "what appeared to be burnt clothing," which included a partial zipper

and some plastic or cloth material. The photograph admitted into evidence fails to depict whether the very small amount of burnt material is cloth or plastic. That said, defendant was in custody beginning on November 26, 2008, thus, there is no way to connect him to the burnt object recovered three days later.

¶ 186 In sum, I believe the evidence was insufficient to support defendant's conviction.